UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ESTES CARTER THOMPSON III,<br><br>　　　　Defendant. | Criminal No. 24-cr-10107-JEK |

### GOVERNMENT'S SENTENCING MEMORANDUM

*"The joy and innocence that once lit her face have been replaced by distance and caution. She didn't just lose her innocence that day—she lost her sense of the world."*

　　　　　　　　　　– Victim Impact Statement, Parents of Minor A (Sealed)

*"No child, especially during their formative years, should be burdened with such a horrific truth. The innocence she once had has been stolen."*

　　　　　　　　　　– Victim Impact Statement, Parents of Minor E (Sealed)

### INTRODUCTION

Estes Carter Thompson III took advantage of his position of trust as a flight attendant to select among the passengers on his flights innocent children who he could exploit, directing them to an aircraft bathroom that he had set up as a secret recording studio, recording videos of the children's bodies in one of their most private moments, and then storing, editing, and revisiting those videos, all for his own sexual gratification. In so doing, he robbed five young girls of their innocence and belief in the goodness of the world and the people they would encounter in it, instead leaving them with fear, mistrust, insecurity, and sadness.

For this conduct, the defendant was charged with one count of sexual exploitation of children, and attempt, in violation of 18 U.S.C. § 2251, subsections (a) and (e), and one count of

possession of child pornography depicting a prepubescent minor, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2). He pled guilty to both counts pursuant a "C" plea agreement in which the parties agreed to a sentence of 15-20 years in prison and 5 years of supervised release. For the reasons outlined below and to be articulated at the sentencing hearing, the government respectfully requests that this Court impose a sentence of 20 years of incarceration and 5 years of supervised release, with the conditions recommended by Probation.

## FACTS

The government relies on and incorporates the facts as set forth in the statement of offense conduct in paragraphs 9 through 25 of the Presentence Investigation Report ("PSR").

**Minor A**

On September 2, 2023, while working as a flight attendant on American Airlines flight 1441 en route from Charlotte, NC to Boston, MA, while the aircraft was in flight, Thompson attempted to surreptitiously video-record a 14-year-old female passenger, Minor A, as she used the lavatory and thereby exposed her genitalia and anus. PSR ¶ 10. Specifically, while Minor A was waiting to use the main cabin lavatory, Thompson approached and told her that she could use the first class lavatory. He escorted her to the front of the plane. He went into the first class lavatory and surreptitiously attached his iPhone 12 to underside of the toilet seat lid using red "Inoperative Catering Equipment" stickers, and set the phone's camera to record. He told Minor A that the lavatory's toilet seat was broken. After he exited the lavatory, he allowed Minor A to enter. PSR ¶ 11.

When she entered the lavatory, Minor A observed red stickers on the underside of the toilet seat lid, which was in the open position, but did not notice the phone underneath them. She proceeded to partially undress, removing or pulling down her shorts and underwear in order to

utilize the toilet, such that her genitalia and anus were exposed to the camera she was unaware was there. When Minor A was done, she stood up, dressed, and turned to flush the toilet. When she turned, Minor A then noticed that an iPhone was protruding out from underneath the red stickers. The flash of the iPhone was now constantly illuminated, drawing her attention. Minor A used her phone to take a picture of the red stickers and concealed iPhone in order to show it and report what happened to her parents. After she exited the lavatory, Thompson immediately entered the lavatory and removed his iPhone. PSR ¶ 12.

After Minor A reported what had happened to her mother, Minor A's mother reported it to flight attendants and to Minor A's father. After flight attendants and Minor A's father confronted Thompson, Thompson took his iPhone into the lavatory, where he restored the phone to factory settings, wiping all content from the phone. Thereafter, he logged back in to his iCloud account that was associated with his gmail address. PSR ¶ 13.

Once the flight landed, investigators seized Thompson's iPhone and carry-on luggage, and later obtained a search warrant for them, as well as search warrants for his iCloud account. PSR ¶ 14. Eleven "INOPERATIVE CATERING EQUIPMENT" stickers, of the type observed by Minor A on the back of the toilet seat on board the flight on September 2, 2023 were located inside the suitcase and seized. Thompson's United States passport was also located in the suitcase, as were numerous carbon-copies of American Airlines forms pertaining to unaccompanied minors. PSR ¶ 15. Forensic examination of Thompson's iPhone confirmed that it had been reset to factory settings at 9:31:30 am ET on September 2, 2023, while the aircraft was in flight from Charlotte to Boston, and about half an hour after Minor A had taken the photo of Thompson's iPhone attached to the toilet lid. Accordingly, no images or files remained on his phone. PSR ¶ 16.

iCloud search warrant returns demonstrated that Thompson's iPhone 12 had been registered to that iCloud account since September 2021. They also demonstrated that, after restoring his phone to factory settings while the aircraft was in flight, Thompson had reconnected his iPhone 12 to his iCloud account. Thompson's iPhone 12 was signed into his iCloud account when investigators examined the phone on the ground in Boston on September 2. PSR ¶ 17.

Among the contents of Thompson's iCloud account, agents identified four additional instances other than that involving Minor A in which Thompson recorded a minor using the lavatory on an aircraft. Thompson possessed those recordings and images, which constitute child pornography, in his iCloud account while he was on the ground in Boston on September 2, 2023. PSR ¶ 18. Thompson's iPhone, used to attempt to record Minor A and to record the four other children, was manufactured outside of the United States. The images of the four children were backed up to and stored in Thompson's iCloud account using the internet.

**Minor B**

Within Thompson's iCloud account was a video he recorded on his iPhone 12 Pro at 8:57:42 AM ET on August 23, 2023. AA records indicate that Thompson was working as a flight attendant aboard AA flight 1617 from Charlotte, North Carolina, to Denver, Colorado, when that video was created. The video is 1 minute and 49 seconds in duration. The video depicts Thompson attaching what is believed to be his iPhone to a spot above the toilet seat in an aircraft lavatory using Inoperative Catering Equipment stickers. It then depicts a pre-pubescent female child, later identified as Minor B, YOB 2017, entering the lavatory, undressing, using the toilet such that her genitalia and anus are exposed to the camera, dressing, and exiting. It then depicts an individual believed to be Thompson entering the lavatory and removing the phone and stickers. A version of

this video, shortened and modified to play in slow motion, was also located in Thompson's iCloud account. PSR ¶ 20.

**Minor C**

Within Thompson's iCloud account was a video he recorded on his iPhone 12 Pro at 12:34:18 PM EDT on August 15, 2023. AA records indicate that Thompson was working as a flight attendant on AA flight 2080 flying from Orlando, Florida, to Charlotte, North Carolina, when the video was created. The video is 36 seconds in duration. This video likewise depicts Thompson showing a prepubescent female child, later identified as Minor C, YOB 2011, into the airplane lavatory before the child partially undresses, uses the toilet such that her genitalia and anus are exposed to the camera, dresses, and leaves. A version of this video, shortened and modified to play in slow motion, was also located in the account. PSR ¶ 21.

**Minor D**

Within Thompson's iCloud account was a video he recorded on his iPhone 12 Pro at 5:57:21 PM EDT on July 26, 2023. Thompson was working as a flight attendant aboard American Airlines flight 1615 flying from Charlotte, North Carolina, to Kansas City, Missouri, at the time. The video is 2 minutes and 15 seconds in duration. The video was taken in an airplane lavatory from a similar angle, and depicts a pubescent female child (later identified as Minor D, YOB 2009) partially undressing, using the toilet such that her genitalia and anus are exposed to the camera, dressing, and leaving. A version of this video, modified to play in slow motion, was also located in the account. Agents also located approximately 98 still images that appear to be screen shots or extracted frames of the source video, generally depicting Minor D's buttocks and genitalia. PSR ¶ 22.

**Minor E**

Within Thompson's iCloud account was a video he recorded on his iPhone 12 Pro at 9:42:55 PM CT on January 26, 2023. AA records indicate that Thompson was working as a flight attendant aboard American Airlines flight 2869 flying from Austin, Texas, to Los Angeles, California, at the time. The video, which plays in slow motion, is 7 minutes and 59 seconds in duration. The video depicts a pre-pubescent female child later identified as Minor E, YOB 2013, entering the lavatory, partially undressing, using the toilet such that her genitalia and anus are exposed to the camera, dressing, and exiting. Within Thompson's iCloud account, agents also discovered approximately 272 still images of Minor E that appear to be screen shots or extracted frames from the video, along with edited versions of those images, that generally show Minor E's buttocks and genitalia. The edits include cropping the lavatory background, zooming in on Minor E, and placing close-up views of Minor E's genitals side-by-side with those of her face. PSR ¶ 23.

**Minor F**

Thompson also possessed an additional 50 images of a sixth child (Minor F, YOB 2013), who was traveling as an unaccompanied minor on a flight on which he was working as a flight attendant; these images include the child sleeping and include images focused on the child's clothed buttocks as she de-planed. They do not constitute child pornography. PSR ¶ 24.

**Artificial Intelligence**

Agents located additional evidence of Thompson's sexual interest in children within his iCloud account. For example, agents have located hundreds of images of what appears to be child pornography created through an artificial intelligence ("AI") web site. Screenshots of the words that the user of the web site (believed to be Thompson) typed into the AI site in an effort to create

6

images depicting children engaged in sexual activity were stored in Thompson's iCloud account. PSR ¶ 25.

## DISCUSSION

### I.  Sentencing Guideline Calculation

Based on its computation of the defendant's total offense level as 42 and his criminal history category as I, the United States Probation Office ("Probation") has computed a Guideline sentence in this case to include a term of incarceration from 360 to 600 months; the Guideline range of supervised release is five years to life.  The government agrees with Probation's calculation of the defendant's Offense Level and Criminal History Category, and thus agrees with its determination of his Guideline sentencing range (GSR) as outlined above.  The parties in the plea agreement calculated the defendant's total offense level as 43, erroneously assigning a 5-level rather than a 4-level increase under USSG § 3D1.4 to reflect the multiple count adjustment. *Compare* Dkt. No. 76 at ¶ 4(c) *with* PSR ¶¶ 62-64.  The parties have agreed to modify paragraph 4 of the plea agreement in open court to reflect the proper calculation of the Guidelines as stated in the PSR.  This modification does not impact the agreed-upon sentencing range of 15 to 20 years in prison.

The government urges that this Court impose the maximum sentence permitted by the plea agreement, to reflect the serious harm that the defendant caused to the five children he exploited and their families: 20 years in prison plus five years of supervised release, with the conditions recommended by Probation.

### II.  Restitution, Special Assessment, and Forfeiture.

None of the victims submitted restitution requests.  As to assessments, as this Court is aware, Title 18, United States Code, Section 3014 provides that courts "shall assess an amount of

$5,000 on any non-indigent person" convicted of enumerated offenses related to human trafficking and sexual exploitation, including possession of child pornography in violation of 18 U.S.C. § 2252A. *Id.* § 3014(a). Where the government believes that the defendant will be able to establish[1] that he is indigent – and thus not subject to the special assessment – the government does not advocate for the imposition of this "JVTA" assessment, and the parties agreed there should be no such assessment.

The defendant's ability to pay is also a factor to consider in determining what assessment, if any, this Court should impose pursuant to 18 U.S.C. § 2259A.[2] Where the defendant faces a lengthy prison sentence, the government does not advocate for the imposition of this "AVAA" assessment, and the parties agreed there should be no such assessment.

The defendant is required to pay the mandatory $200 special assessment.

As to forfeiture, the defendant has agreed to forfeiture of, among other items, the iCloud account associated with his Apple ID, his iPhone 12 Pro, his Motorola smartphone, and his Apple laptop. Dkt. No. 76 at ¶ 7.

### III.      Application of the § 3553(a) Factors and Guideline Specific Offense Characteristics

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining a

---

[1] The defendant bears the burden of proving indigence in this context. *United States v. Kelley*, 861 F.3d 790, 800 (8th Cir. 2017). The government believes that the Court may determine whether he has met that burden without a hearing. The "detailed discussion of [the defendant's] financial situation, including his assets, income, liabilities, and expenses" outlined in the PSR "is sufficient to permit appellate review of the district court's decision to impose the $5,000 special assessment." *United States v. Lail*, 736 F. App'x. 381, 382 (4th Cir. 2018).

[2] Monies paid under this section are deposited and pooled in the "Child Pornography Victims Reserve" established in 18 U.S.C. § 2259B, which is the fund from which child pornography victims can receive a one-time fixed amount of compensation instead of seeking restitution on a case-by-case basis.

sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in § 3553(a)(2). These factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide for the needs of the defendant. They also require courts to consider the kinds of sentences available and the GSR.

For the reasons outlined in the government's filings, and those to be articulated at the sentencing hearing, the government submits that its recommended sentence of 20 years in prison, as well as five years of supervised release with the standard conditions and special conditions recommended by Probation, is reasonable and necessary in this case to promote respect for the law, to adequately punish the defendant for his criminal conduct, to deter him and others from offending in the same ways again, and – most critically here – to protect the public, particularly vulnerable children.

    **A. <u>Nature and Circumstances of the Offense; Need for Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment and Deterrence, and Protect the Public</u>**

The government understands that the Guidelines sentencing ranges for child exploitation crimes in general are quite high as compared to the ranges for many other crimes that are prosecuted in federal court. That distinction is not without reason: both Congress, in setting the mandatory minimum sentence of incarceration applicable to the sexual exploitation offense, and the Sentencing Commission, in developing the Guidelines and specific offense characteristics applicable to his conduct, clearly recognize that individuals who prey on the most vulnerable members of our society merit truly significant punishment that is commensurate with the harm

they cause and the danger they pose. A significant sentence is necessary to reflect the gravity of the defendant's crimes. As the Sentencing Commission found in its 2012 report to Congress,[3] "all child pornography offenses are extremely serious because they both perpetuate harm to victims and normalize and validate the sexual exploitation of children." *Id.* at 311. Moreover, while the guidelines pertaining to child pornography offenses are often criticized, notably here the defendant's GSR is calculated under a different guideline applicable to sexual exploitation cases, which do not receive the same criticism. *See* U.S. Sent'g Comm'n, Report to the Congress: Federal Child Pornography Offenses (2012) at 247 n. 2 ("The Commission's 2010 survey of federal district judges revealed that the vast majority of judges surveyed stated that the guideline and statutory penalty ranges in production cases were appropriate as a general matter.")

The seriousness of the offense, and the appropriateness of a significant sentence, is particularly evident here, where the defendant selected for exploitation children as young as six years old who were in his care on board an airplane, directed them to the bathroom that he had turned into a secret recording studio, and created surreptitious recordings of their genitals and anuses for his own sexual gratification. He did this on five separate occasions over the course of a year, and no doubt would have continued this course of conduct had Minor A not had the presence of mind well beyond her years to take a photograph of the phone that she noticed taped to the back of the toilet seat and report the incident to her parents, who promptly reported to another flight attendant, setting into motion the chain of events leading to the investigation of the full scope of the defendant's conduct and the defendant's ultimate arrest.

---

[3] Available at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Chapter_12.pdf (last accessed July 15, 2025).

It is difficult to overstate the seriousness of the defendant's crime and the effects that it has had and is expected to continue to have on Minor A, Minor B, Minor C, Minor D, and Minor E and their families throughout their lives. The victims' parents' descriptions of the ordeals their daughters have faced since learning how they were violated are heart-wrenching. Minor A's parents describe how she is "not the same child" anymore, and how her trust in adults and men in particular has been eviscerated. *See* Sealed Victim Impact Statement of Minor A's Family. They describe how she "flinches at physical contact, runs with a knife for protection, and avoids conversations" and "has folded into herself" in ways no child should have to. *Id.* "[S]he lost her sense of the world" the day she learned she had been exploited. *Id.* Her entire family now struggles to communicate and show affection without "walking on emotional glass." *Id.* Likewise, Minor E's family describes having to do the "unimaginable" and explain to their daughter what had happened to her, struggling to find the words to explain what the defendant had filmed of her body and why. *See* Sealed Victim Impact Statement of Minor E's Family. The experience "shattered" her parents and left Minor E "scared, hyper-aware of her surroundings, and profoundly distrustful of adults," including and especially those she had been taught to believe were looking out for her. *Id.* She is "robbed… of her sense of safety," "hesitant to travel, afraid of public spaces, overwhelmed at the thought of using [public] restrooms," and is "withdrawn from others." *Id.* She worries about friends or strangers finding images of her on the internet. No child should have to worry about her privacy and safety when using the bathroom, or worry about images secretly taken of her body turning up on the internet and being viewed by friends or strangers,[4] or feel suspicious of men or authority figures. The harms caused by the defendant are numerous and run

---

[4] There is no evidence that Thompson distributed the videos he took or still images he created of them; however, the victims understandably have the fear that he did.

11

deep, and will likely be felt by these children and their families for years. A sentence of 20 years in prison will provide at least some peace of mind to these children and their families throughout the remainder of their childhood and into their young adult years, that they do not need to look over their shoulders and fear the defendant could be there – some space for them to heal and move forward with their lives.

Despite the fact that the Sentencing Guidelines reflect a choice, and a reasonable one, to bring the full weight of the law against those who prey on the most vulnerable members of society, here, the government has agreed in a plea agreement to recommend a sentence of 20 years in prison, representing a substantial sentence but also a substantial decrease from the GSR. This sentence reflects a reasonable sentence based upon this set of facts, the needs of the victims, and the characteristics of this particular defendant; properly effectuates all of the goals of sentencing; and is sufficient, but not greater than necessary, to reflect the seriousness of the offense and the goals of sentencing. Any further decrease would not properly account for the seriousness of the offense and the depth of the harm the defendant caused the victims and their families.

### B. The History and Characteristics of the Defendant

The defendant's background, described in PSR ¶¶ 78-96 as well as in the psychosexual evaluation that he commissioned,[5] does not explain or mitigate his conduct. He was raised in a loving, middle class family, and enjoyed good relationships with his family and community members. He played multiple sports in school including varsity football, graduated high school as an honor roll student, and earned a college degree. He had a positive social life in high school

---

[5] The Report of Psychological and Sexual Evaluation of Estes Thompson, submitted by Leo D. Keating, LICSW, and submitted under seal by the defense, is cited as the "Keating Report."

and college. He had a good job at a national airline from 2011 through the date of his sexual exploitation of Minor A on September 2, 2023.

The government acknowledges that Thompson has experienced symptoms of depression and anxiety, and that he has had recurring issues with drinking to excess throughout his adult life. Notably, however, he reports that "he would never drink before or during work hours" (Keating Report at 4), so alcohol was not a direct factor at the times he was sexually exploiting children on board aircraft. Thompson indicates that alcohol was a factor in his viewing pornography, and in seeking out child pornography. Keating Report at 5.

The conclusion of the psychosexual evaluation that Thompson commissioned – that, if his social and psychological deficits are properly addressed, he "represents a low risk to engage in future misconduct" (Keating Report at 9) – appears unreliable because there are numerous problems with the way Keating conducted his analysis. Significantly, the government notes that Keating did not appear to know that Thompson had engaged in the same conduct on five separate occasions[6] or, if he knew it, did not address that factor at all in his analysis, when it is common sense that a person who has offended numerous times over a lengthy period of time is more likely to reoffend. Keating states that he believes "[Thompson's] filming is an isolated behavior" without ever grappling with the inconsistent fact that Thompson engaged in this conduct on five separate occasions over the course of a year.

---

[6] Keating states that he reviewed "an affidavit describing Mr. Thompson's offense" (Keating Report at 3) but does not specify which affidavit he reviewed. The affidavit in support of the original search warrants, for example, did not describe the incidents involving the children other than Minor A, because the investigation was ongoing and those incidents had not yet been discovered. Keating's recounting of Thompson's description of his offense appears to discuss a singular incident, although the last sentence of that section does refer to "filming of children" and "the victims" in the plural. Keating Report at 6.

13

Notably, Keating did not use "the most commonly used risk assessment tool for individuals charged or convicted of sexual offenses," the Static-99R.  Helmus, L. M., Kelley, S. M., Frazier, A., Fernandez, Y. M., Lee, S. C., Rettenberger, M., & Boccaccini, M. T. (2022). Static-99R: Strengths, limitations, predictive accuracy meta-analysis, and legal admissibility review. Psychology, Public Policy, and Law, 28(3), 307–331. https://psycnet.apa.org/fulltext/2022-61121-001.html) (last accessed July 15, 2025).  The limited testing that Keating did complete indicates that Thompson "shows deviant sexual interest in girls between the ages of six and 13," which is consistent with Thompson's reporting that he has looked at child pornography involving "young girls around the ages of 11" ever since his own childhood, and is cause for concern.  Keating Report at 5, 7.  Finally, Thompson's self-serving statements that he has never had sexual contact with a minor child and his "self-report" within the Abel Assessment suggesting that he "does not harbor beliefs or attitudes that would support abuse of children"  (Keating Report at 5, 7) are entitled to little weight.

The government recognizes that it is always difficult to quantify in years "how much" is "enough" to adequately punish the defendant, deter similar criminal conduct, and protect the public.  Given the reprehensible conduct here, and the lengthy GSR, a longer sentence recommendation could have been made.  In making the recommendation that it does, the government has considered all of the individual facts of this case, the needs of the victims, the characteristics of the defendant, and the defendant's acceptance of responsibility through his guilty plea in this matter, obviating the need for any of the victims or their family members to testify.

### C. Avoiding Unwarranted Sentencing Disparities

The government's recommended sentence is in line with – and somewhat lower than – national sentences for similar crimes by defendants with similar criminal history.  JSIN data

14

indicate that over the last five fiscal years, there were 241 defendants whose primary guideline was § 2G2.1, with a final offense level of 42 and CHC I, after excluding defendants who received a § 5K1.1 departure. PSR ¶ 118. The average length of imprisonment was 299 months and the median length was 300 months – i.e., 25 years. Accordingly, the government's recommendation of 20 years is somewhat lower than the average sentence actually imposed. This reduction from the average adequately takes into account the defendant's anticipated argument that his conduct here is not as bad as the conduct of some other defendants convicted of the same crime, because the videos he created were not depictions of sexual abuse.

Indeed, many defendants in this District convicted of sexual exploitation of children have received significantly longer sentences than the government asks for here, and those cases typically involved the recording of actual sexual abuse of a child. *See United States v. Monson*, 18-cr-30015-MGM (defendant who created child pornography depicting sexual abuse of child known to him sentenced to 40 years); *United States v. Toronto*, 17-cr-10307-FDS (defendant with no record who produced child pornography depicting sexual abuse of two minor victims sentenced to 40 years); *United States v. Decarolis*, 19-cr-40038-TSH (defendant who produced child pornography involving five minors sentenced to 38 years); *United States v. Germaine*, 17-cr-30010-ADB (defendant who created child pornography depicting sexual abuse of child known to him sentenced to 35 years pursuant to plea agreement); *United States v. Abreu,* 19-cr-10460-PBS (defendant who created child pornography depicting his sexual abuse of a 12-year-old child sentenced to over 26 years); *United States v. Cyr,* 20-cr- 10303-LTS (defendant who created child pornography depicting sexual abuse of a toddler and sexual exploitation of a 7-year-old in her care sentenced to 25 years in prison); *United States v. Lee*, 18-cr-10105-IT (defendant with

15

no record who used messaging application to direct New Hampshire male to produce specific child pornography depicting sexual abuse of child known to that person sentenced to 20 years).

However, any argument that this case does not fall squarely within 18 U.S.C. § 2251 fails.  The defendant created sexually explicit videos and images of children as young as six years old – real children that he interacted with and directed into the situation that allowed him to create those videos and images.  This behavior falls squarely within the ambit of 18 U.S.C. § 2251, and has caused precisely the types of harms that the statute aims to protect children from.

The government has identified two cases in this district with somewhat similar facts in which the sexual exploitation did not involve the defendant or another individual sexually abusing the child and the defendant received a similar sentence to that which the government is advocating here. In *United States v. Bennett*, 17-cr-10221-ADB, a stepdad who made surreptitious recordings of his two preteen/teen stepdaughters in their home and then shared them with others on the internet was sentenced to 20 years in prison (Dkt. No. 56).  Although the distribution of the images was an aggravating factor not present here, the fact that there were five separate victims in this case is an aggravating factor not present there.  In *United States v. Acevedo*, 21-cr-10355-PBS, a man with a prior conviction for a child pornography offense who convinced a minor in another state to masturbate nude for him over video chat was sentenced to 22 years in prison.  Dkt. No. 123.  Although Acevedo's recidivism was an aggravating factor not present here, the fact that Thompson did this on five separate occasions to five separate children is an aggravating factor not present there.

The government is aware of *United States v. Thai*, in which a defendant who recorded videos of boys using the restroom at a school, on 10 separate dates over the course of a year, was sentenced to 12 years in prison.  Dkt. No. 87.  That case is distinguishable because that defendant

was convicted only of possession of child pornography, not sexual exploitation, and his guidelines range was less than half of the guidelines range here: 168 months to 210 months there, as opposed to 360 to 600 months here. Moreover, the resolution in that case reflected special concerns not present here about the potential need for victims to testify in court, which led the government to dismiss the sexual exploitation charges in that case and agree to the lower sentence. Dkt. No. 83 at 4.

Here, the government's recommended sentence of 20 years would avoid unwarranted disparities between the sentence of the defendant and similarly situated defendants nationally and in this district.

## CONCLUSION

For all of the foregoing reasons, the government respectfully recommends that this Court sentence the defendant to 20 years in prison and a period of 5 years of supervised release. Such a sentence would be sufficient, but not greater than necessary, to reflect the seriousness of the offense and the goals of sentencing.

Respectfully submitted,

UNITED STATES OF AMERICA,
By its attorney,

LEAH B. FOLEY
United States Attorney

*/s/ Elianna J. Nuzum*
Elianna J. Nuzum
Assistant United States Attorney
John Joseph Moakley U.S. Courthouse
One Courthouse Way, Suite 9200
Boston, MA 02210
elianna.nuzum@usdoj.gov
617.748.3100

Dated: July 16, 2025

## CERTIFICATE OF SERVICE

      Undersigned counsel certifies that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                                                     */s/ Elianna J. Nuzum*
                                                       Elianna J. Nuzum
                                                       Assistant United States Attorney

Dated: July 16, 2025